[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
Facts:
This is a real estate tax appeal involving a 941 unit apartment complex commonly known as "Century Hills" located on CT Page 7435 70.56 acres at 98 Cold Spring Road in Rocky Hill, Connecticut. The plaintiff, 84 Century Limited Partnership (Century) appeals from the refusal of the Board of Tax Review for the Town of Rocky Hill to reduce assessments on the grand lists of October 1, 1992, October 1, 1993, and October 1, 1994. . . . The parties agree that the determination of value is based on the decennial revaluation of October 1, 1989.
Century purchased the subject property on March 29, 1984 for $57,397,460. . . . The Towers and the Gallery buildings were constructed in 1972. The Glenbrook buildings were constructed in 1975. The properties are a nonconforming use located in a "R-15" residential zone and contain approximately 929,000 rentable square feet.
Both Robert Hunter, the appraiser for Century, and Robert Flanagan, the appraiser for the town, found that the highest and best use of the subject property was for a rental apartment development. We agree. Both appraisers agreed that the income approach to determine value on October 1, 1989 was the best approach. However Hunter relied on the direct capitalization analysis of value, whereas Flanagan relied on the discounted cash flow analysis of value.
Discussion:
There are two methods under the income capitalization approach, which are based on different measures of expected earnings — direct capitalization and yield capitalization. The Appraisal of Real Estate (10th Ed. 1992), p. 419. "Direct Capitalization is a method used to convert an estimate of a single year's income expectancy into an indication of value in one direct step — either by dividing the income estimate by an appropriate income rate or by multiplying the income estimate by an appropriate factor." Id. On the other hand, "Yield Capitalization is a method used to convert future benefits into present value by discounting each future benefit at an appropriate yield rate or by developing an overall rate that explicitly reflects the investment income pattern, value change, and yield rate." Id., p. 420. Yield capitalization is also known as "discounted cash flow" analysis. Id.
Using the direct capitalization approach, Hunter, as of October 1, 1989, developed pro forma potential gross income and operating expenses for one year, then selected an appropriate capitalization rate as well as a tax loaded capitalization rate to determine fair market value. CT Page 7436
Flanagan, in using the discounted cash flow analysis, projected income and operating expenses over a five year period. The annual cash flow was discounted for the holding period as well as the reversion at a specified yield rate to arrive at the fair market value of the complex.
Hunter determined that the fair market value of the subject property on October 1, 1989, was $39,800,000.
Flanagan determined that the fair market value of the subject property on October 1, 1989, was $46,000,000.
Hunter determined the gross effective income for the subject property on October 1, 1989, to be $7,625,966. This amount was arrived at by estimating the gross potential income at $8,431,620. To this amount Hunter added income to the property from laundry, parking and recreation totalling $206,140, less a vacancy factor of 12% ($1,011, 794). Hunter developed a stabilized operating statement showing operating expenses for 1989 of $3,288,988, leaving a net operating income of $4,336,978. Hunter then went on to develop an overall capitalization rate of 9.6%. To this capitalization rate, Hunter added a tax-loaded capitalization rate of 1.288% to account for taxes on October 1, 1989, as an added expense. This resulted in a tax-loaded capitalization rate of 10.9% (9.6% + 1.288%). Taking the net operating income of $4,336,978 divided by the tax-loaded capitalization rate of 10.9%, Hunter arrived at the market value for the subject property of $39,800,000.
Flanagan took the actual income for 1989 of $7,635,000 as his first year' s income. . . . Flanagan then increased the income for each of the next four years by 3%. Although Flanagan used the actual income from the subject for 1989, he did not use the actual operating expenses for the same year. Flanagan was of the opinion that although the administration and leasing expenses and maintenance and repair expenses were the actual figures, he considered them to be too high when comparing them to other statistical data. Instead of using the actual administration and leasing expenses of $1,094,142, Flanagan used $839,850. As to maintenance and repairs, Flanagan reduced the amount of these items for 1989 from $1,363,270 to $1,183,408. The resulting operating expenses for 1989 were $3,102,432. Flanagan subtracted the adjusted net operating expenses of $3,102,432 from the actual income of $7,635,002 to arrive at the net operating income for 1989 of $4,532,570. Flanagan, considering inflationary growth, increased the 1989 operating CT Page 7437 expenses by 3% for each of the next four years. Flanagan then developed a capitalization rate for present value of 10.5%. According to Flanagan, not only would the investor seek the income stream as a basis of purchasing the subject property, but also the investor would look at the residual value of the property at the end of the five year period.
Basically, Flanagan took the projected income for year five and multiplied that by 11%, recognizing the degree of risk. Flanagan's value of the reversion amounted to $28,147,174. Adding the total income stream for five years and the reversionary value multiplied by the capitalization rate of 10.5%, Flanagan determined that the market value of the complex was $46,000,000 on October 1, 1989. As we have previously noted, Hunter, in arriving at his opinion of fair market value of the subject property at $39,800,000, used a market generated rental income for 1989. However, in developing operating expenses, Hunter used the actual operating expenses generated by the subject property rather than market expenses. The expenses used by Hunter to determine value in 1989 under the direct capitalization approach consisted of $3,288,988 after deducting taxes of $512,624. Conversely, Flanagan used the actual income figures his discounted cash flow analysis starting in the year 1989, and a mixture of actual operating expenses and market expenses resulting from statistical data. Our Supreme Court has recognized that "[f]ixing the value of real property for taxation purposes cannot be accomplished by any single method applicable to all situations. It is largely a question of fact for the trier, using such means as are suggested by the evidence, if those means in reason and logic appear to accomplish a just result and one consonant with the trier's own unbiased judgment." Sheldon House Club, Inc. v.Branford, 149 Conn. 28, 33, 175 A.2d 186 (1961), citing NationalFolding Box Co. v. New Haven, 146 Conn. 578, 588, 153 A.2d 420
(1959).
Although Hunter used a recognized method of direct capitalization showing value at one specific point in time, we agree with Flanagan's opinion that a more accurate determination of the value of the subject property on October 1, 1989, could be made using the discount cash flow analysis. The discount cash flow analysis by Flanagan covered income and expenses over a five year period.
In using the discount cash flow analysis, it is important to base the analysis on accurate, reliable information. The Appraisal of Real Estate, supra, p. 532. Under the discount cash flow analysis an investor is looking for anticipated future benefits and estimating CT Page 7438 their present value. Id., p. 409. This requires an investor to determine what the future benefits of the subject property would be on October 1, 1989, the date of assessment. See Portland Silk Co. v.Middletown, 125 Conn. 172, 175, 4 A.2d 422 (1939).
Although Hunter determined the historical operating expenses for 1989 to be $3,632,431, he concluded that stabilized operating expenses for 1989 would amount to $3,288,988. Flanagan, on the other hand, computed the actual operating expenses for the subject property for 1989 to be $3,102,432, some $529,999 less than the $3,632,431 found by Hunter. Flanagan expressed concern about the excessive management costs when comparing the actual management expenses of Century to data obtained from nationally recognized publications.
Hunter gave a detailed analysis of the factors going into the development of the actual stabilized operating expenses for 1989, which we consider more credible than Flanagan's stabilized operating expenses, adjusted for excessive management costs. Accepting as we do, Flanagan's discount cash flow process, we add 3% per year for five years to Hunter's stabilized operating expenses of $3,288,988.
Basically, we end up using Hunter's market income and stabilized operating expenses with Flanagan's discount cash flow analysis. This results in the following chart, which results in a finding of fair market value for the subject property of $44,071,091.
Year 1 Year 2 Year 3 Year 4 Year 5
Hunter's Market Income $7,625,966 $7,854,744 $8,090,386 $8,333,097 $8,583,089
Hunter's Stabilized Operating Expenses -3,288,988 -3,387,657 -3,489,286 -3,593,964 -3,701,782
Net Operating Income $4,336,978 $4,467,087 $4,601,100 $4,739,133 $4,881,307 CT Page 7439
Flanagan's Present Value Factor (10.5%) x .904977 x .818984 x .741162 x .670735 x .607000 -------- -------- -------- -------- -------- Present Value Income Stream $3,924,865 $3,658,472 $3,410,160 $3,178,702 $2,962,953
Present Value of Income Stream $17,135,152 Reversion — $4,881,307 divided by 11% = $44,375,518 Present Value of Reversion $44,375,518 x (10.5% — 5 yrs.) 0.607000 = $26,935,939 ----------- Fair Market Value of Subject Property — $44,071,091
"The goal of property valuation is to determine the `present, true and actual value' of the subject property. . . . `The process of valuation at best is a matter of approximation. National Folding Box Co.v. New Haven, 146 Conn. 578, 586, 153 A.2d 420 (1959).' State v.Frilando, 182 Conn. 397, 399, 438 A.2d 413 (1980)." (Citations omitted.) First Bethel Associates v. Bethel, 231 Conn. 731, 738, ___ A.2d ___ (1995). We have arrived at the conclusion that the true and actual value of the subject property on October 1, 1989 was $44,071,091 "by weighing the opinion of the appraisers, the claims of the parties in light of all the circumstances in evidence bearing on value, and [our] own general knowledge of the elements going to establish value." Id., 743.
The plaintiff's appeal is sustained, and the defendant is ordered to reduce the fair market value of the subject property from $45,821,600 to $44,071,091 on the grand lists of October 1, 1992, October 1, 1993, October 1, 1994, and thereafter until the next decennial revaluation.